## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

Case No.  HG 05-21732

LUCRE, INC.,

Debtor.

_____/

THOMAS C. RICHARDSON, Trustee,

Plaintiff,

vs.

Adv. Pro. No.  09-80136

MICHIGAN BELL TELEPHONE COMPANY
d/b/a AT&T MICHIGAN (f/k/a SBC Michigan),

Defendant.

_____/

### OPINION RE: MICHIGAN BELL'S JULY 21, 2009 MOTION - SUMMARY JUDGMENT

### OPINION RE: TRUSTEE'S AUGUST 21, 2009 MOTION - SUMMARY JUDGMENT

Appearances:

Michael S. McElwee, Esq., Grand Rapids, Michigan, attorney for Plaintiff/Trustee
Dawn R. Copley, Esq., Detroit, Michigan, attorney for Defendant

This adversary proceeding involves the reconciliation of numerous billing accounts between Lucre, Inc. ("Lucre") and Michigan Bell Telephone Company, which does business as AT&T Michigan ("AT&T").  Each party has filed a motion for summary judgment in favor of their respective positions.  Both motions are denied.

## PROCEDURAL BACKGROUND

Lucre is currently operating as a reorganized debtor pursuant to the terms of a confirmed Chapter 11 plan. Thomas C. Richardson ("Richardson") was appointed as the Chapter 11 trustee during the pendency of the Chapter 11 case and he has continued to serve in that capacity even after confirmation. Included among his post-confirmation duties is the administration of claims filed against the estate.

AT&T has filed both a request for administrative expenses and a proof of claim for prepetition debt. Both are most recently expressed in a February 18, 2009 filing in the base case (the "February 18, 2009 Request/Claim"). The amount requested as a Section 503(b)(1)[1] administrative expense is $1,107,706.46,[2] and the amount claimed as an unsecured prepetition debt is $933,584.75.

Richardson not only objects to the February 18, 2009 Request/Claim but also asserts that AT&T owes the estate money for postpetition services provided by Lucre and for late charges associated with AT&T's delay in paying for the same. The recovery he seeks after setoff is $417,372.75. As for AT&T's prepetition claim, Richardson actually believes that more is owed than AT&T has claimed.[3]

---

[1] 11 U.S.C. § 503(b). The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

[2] According to AT&T, this amount is calculated only through December 31, 2008 and, as such, its final administrative claim may be even larger.

[3] $1,010.942.23 as opposed to $933,584.75.

2

AT&T and Richardson have filed competing motions for summary judgment.[4] Each party's position is supported by both pre- and post-hearing briefs, together with supporting affidavits and documents. Each party also offered oral argument at the scheduled hearing.[5]

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. FED. R. BANKR. P. 7056 and FED. R. CIV. P. 56(c)(2). The court, in considering a motion for summary judgment, is to focus only upon material facts; that is, the court is to consider only those facts that are important vis-a-vis the applicable substantive law. Moreover, in determining whether there is a genuine dispute between the parties, the court is to draw all inferences from the record before it in the light most favorable to the non-moving party. If, though, the pertinent record would not lead a rational trier of fact to find for the non-moving party even under such favorable circumstances, summary judgment should be granted.

## FACTUAL BACKGROUND

Lucre provides telecommunication services to its customers. AT&T is Lucre's competitor. Unfortunately for Lucre, AT&T is also Lucre's vendor and Lucre's customer.

---

[4]Trustee's motion asks that AT&T's administrative claim be disallowed and that a money judgment be entered in its favor. On the other hand, AT&T's motion seeks only a declaration that (1) the rates it used with respect to calculating its administrative claim against Lucre are per se reasonable; and (2) that the late charges Lucre has attempted to assess against it are inappropriate because AT&T justifiably withheld the payments giving rise to those charges. Otherwise, AT&T is content at this time to proceed to trial with respect to whatever else remains at issue.

[5]The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b) and W.D. Mich. LCivR 83.2. This is a core proceeding. 28 U.S.C. §§ 157(b)(2)(B) and (C).

3

The Telecommunications Act of 1996[6] is responsible for this awkward relationship. Telephone service at the local level has traditionally been a monopoly because of the tremendous capital outlay associated with establishing and maintaining a comprehensive and secure network. The Act's purpose is to reduce the monopolistic grip that existing providers like AT&T have held in these markets by compelling them to make their networks available to competitors like Lucre. However, AT&T has been at best a grudging participant in this arranged marriage. Indeed, virtually every dispute AT&T or Lucre has brought before this court for resolution has included accusations of sabotage, dilatory conduct, or improper motives.

Lucre's relationship with AT&T, which began in 1997, is memorialized in what is known in the industry as an intercommunication agreement, or "ICA."[7] In this instance, the ICA, with its attendant schedules, is more than an inch thick. Nonetheless, it is still a contract and, therefore, subject to general contract law. The only twist is that the ICA is also subject to regulatory authority, which, in this case, is the Michigan Public Service Commission ("MPSC").

The controversy now before the court focuses primarily upon AT&T's postpetition handling of calls routed through its facilities. The parties anticipated that AT&T's existing system could handle normal volumes of Lucre's traffic. However, the parties also recognized that an excessive volume of calls might overload AT&T's routing device, known as a tandem switch.

---

[6]Pub. L. No. 104-104, 110 Stat. 56 (1996).

[7]Ameritech Michigan is actually the other party to this ICA. However, any number of mergers and other transformations have occurred in the Michigan telecommunications industry during the last ten years and, as a consequence, AT&T Michigan is now the network provider to Lucre.

Traffic from Lucre's Verizon customers did in fact threaten such an overload.[8] Consequently, Lucre and AT&T began discussions in 2001 or 2002 as to how to remedy the problem. Lucre initially took the position that it was AT&T's responsibility under the ICA to augment its system. However, AT&T did not agree and, as a consequence, Lucre decided instead to enter into a separate contract with AT&T to address the Verizon traffic. As Lucre put it: "Lucre was very new to the business at that time and ordered services under the tariff rather than taking AT&T before the MPSC, as it should have."[9]

"Tariff" is one of many specialized terms used in the telecommunications industry. It is a contractual arrangement whereby a telecommunications service is provided at a rate set by the regulatory authority. In this instance, the tariff service that Lucre ordered from AT&T was the routing of all Verizon customer calls through a separate, dedicated circuit as opposed to through AT&T's tandem switch. This dedicated circuit has been referred to by the parties as the "Tariff Circuit" and as a "DEOT."[10] The court will use "Verizon DEOT."

---

[8]In the late 1990s and early 2000s, people "dialed up" the internet – i.e., they accessed the internet through an actual telephone connection – and Lucre provided just such a dial up service through its Grand Rapids operation. However, Verizon customers from, say, Ohio could not take advantage of Lucre's dial up service unless their calls were first routed through AT&T's local telephone system. Therefore, as the popularity of the internet grew with Lucre's Verizon customers, more and more pressure was placed on AT&T's system.

[9]Trustee's Response to AT&T's Brief in Support of Motion for Partial Summary Judgment and Brief in Support of Trustee's Cross-Motion for Summary Judgment [DN 21] at 20, *Richardson v. Michigan Bell Telephone Co. (In re Lucre)*, No. 09-80136 (hereinafter, Pl.'s Br. Mot. Summ. J.").

[10]DEOT is an acronym for "Direct End Office Trunk." A tandem switch is much like a railroad yard where a railcar comes in the yard from one of many tracks and then leaves on an entirely different track. In contrast, a DEOT bypasses the "yard" by taking the call to its intended destination on a single direct line without any switching.

5

Lucre commenced its case in October 2005. AT&T had been charging Lucre $3,185.78 per month for the Verizon DEOT service prepetition and it immediately began billing the same amount to the newly created Chapter 11 estate. However, AT&T's invoices did not include this monthly charge after May 2006. Lucre contends that the billing stopped because Lucre had legitimately terminated the service at that time. AT&T, though, points out that Lucre continued to use the Verizon DEOT for years thereafter and, as a consequence, AT&T contends that it is entitled to continued monthly reimbursement. Indeed, AT&T insists that at some point in time the regulated rate it could charge increased to $17,947.80 per month.[11]

This much higher rate reflects what AT&T contends is the regular tariff for the DEOT service had Lucre ordered it on a month-to-month basis from the outset of the relationship. However, AT&T asserts that Lucre selected an alternate arrangement whereby it was able to pay AT&T a deeply discounted rate of $3,185.78 per month in exchange for Lucre's commitment to use the Verizon DEOT for five years. But, according to AT&T, that five year term expired sometime in 2006 or 2007 without renewal. Therefore, AT&T argues that Lucre's only alternative is to pay it the much higher month-to-month rate for the service it without question continued to enjoy.[12]

---

[11]There clearly remains a genuine issue of fact with respect to this important issue. Lucre's contention that AT&T stopped billing in May 2006 is corroborated, to some extent, by AT&T's August 5, 2008 proof of claim and its accompanying statement that the administrative portion of that claim was through May 1, 2006. However, Steven Hale, one of Lucre's affiants, indicated that AT&T refused Lucre's May 2006 request to terminate the Verizon DEOT service, which would certainly be consistent with AT&T's position that it continued to provide service to Lucre beyond that date.

As for AT&T, it references paragraph 10 of David Egen's affidavit to support its contention that billing in fact continued through the end of 2008. However, Mr. Egan's filed affidavit does not have a paragraph 10 and his affidavit otherwise does not support AT&T's contention.

[12]The tariff sheets AT&T furnished with its brief support its argument that the monthly regulated rate varied based upon the length of the customer's commitment for the service ordered.

6

If these were the only facts, then this court's task would be simply to decide whether an administrative claimant who had originally contracted with the prepetition debtor should be reimbursed at the contract rate or whether some lesser amount should be awarded. However, other factors complicate the matter at hand.

For example, AT&T sought relief from the automatic stay immediately upon the commencement of Lucre's case so that it could terminate all services being provided by it to Lucre, including the Verizon DEOT service. This court granted that relief in March 2006.[13] Lucre's response was to file a motion to assume the ICA together with a request that AT&T be enjoined from terminating services under that agreement pending the motion's adjudication. A preliminary injunction was then granted, which in turn prompted the parties to work out a settlement whereby the ICA would be assumed. Unfortunately, it took over two years for the parties to negotiate that result.

Whether the Verizon DEOT service would continue had been a major roadblock in the negotiations. Lucre wanted to terminate it all along. However, AT&T maintained that Lucre's assumption of the Verizon DEOT was inextricably connected to the ICA, which Lucre did want to assume. AT&T's argument was that (a) Lucre's Verizon traffic would inevitably overload the system unless it was routed through a separate DEOT; and (b) Lucre would be in violation of the ICA if such an overload were to occur. Therefore, AT&T maintained that Lucre could not provide

---

However, AT&T's establishment of the date when the rate changed from $3,185.78 per month to $17,947.80 per month is no more precise than sometime in 2007. Moreover, if, as Lucre at least suggests, the Verizon DEOT service began in 2001, the initial five-year commitment would have ended in 2006, not 2007.

[13]*See In re Lucre, Inc.*, 339 B.R. 648 (Bankr. W.D. Mich. 2006).

it with the necessary assurances of future performance required by Section 365(b)(1) with respect to the ICA's assumption without Lucre also assuming the Verizon DEOT.[14]

Lucre[15] did not agree. It countered with its own argument that it was AT&T's responsibility, not Lucre's, under the ICA to address the overload problems that the Verizon traffic posed. It also contended that AT&T's recent installation of a second tandem switch had added more than enough capacity to alleviate AT&T's concerns. But what actually broke the impasse was Lucre's discovery that it could forgo using AT&T's system altogether with respect to Verizon calls by establishing a much cheaper DEOT (or equivalent) through a third party carrier. Therefore, the problem simply disappeared.

Unfortunately, Lucre's solution created yet two more issues. One is estoppel. Lucre contends that its concession to find a third-party carrier to handle the Verizon traffic was premised upon AT&T's own representations at that time concerning the amount of its administrative claim against the estate and that the figure AT&T provided it did not include what AT&T now claims it is owed for Lucre's postpetition utilization of the Verizon DEOT. Therefore, Lucre argues that AT&T has either waived or is estopped from adding on at this time anything for the months that AT&T claims are to be billed at the $17,947.80 rate.

The other issue the settlement raises relates to the mechanics of actually rerouting the Verizon traffic. According to Lucre, AT&T was to assist in accomplishing this task. Lucre, though,

---

[14]AT&T's *coup de grâce* was its further contention that Lucre could not afford to assume the Verizon DEOT because of the $17,947.80 month-to-month charge that that contract allegedly required for its own continuation.

[15]Although Richardson, as the Chapter 11 trustee, is actually the plaintiff in this adversary proceeding, it is more convenient to refer to him as "Lucre."

claims that AT&T dragged its feet on a project that should have taken only a year to complete but instead took two. Consequently, Lucre refuses to pay AT&T for the last year of Verizon DEOT charges it claims it is due as an administrative expense.

If this were not enough, the administrative claim AT&T asserts also has a bearing on the late charge that Lucre wishes to collect from AT&T. As already indicated, Lucre provided reciprocal services to AT&T and Lucre contends that it is entitled under the ICA to charge late fees for AT&T's failure to timely pay postpetition amounts it owed on account of these services. Lucre's argument for late fees, though, depends upon it establishing that AT&T was not justified in withholding the postpetition amounts owed. According to AT&T, it had the right to withhold payment from Lucre because of a mediated settlement it had reached with Lucre prepetition. AT&T also contends that the ICA limits Lucre's ability to assess late charges to only amounts billed after 2006.

## DISCUSSION

Licenses, Leases, and Executory Contracts.

This court begins by examining the contractual relationship that gives rise to AT&T's administrative claim. Lucre, in a sense, is like the medieval German merchant who had to transport his goods down the Rhine in order to get them to market. AT&T, in turn, is the baron whose castle stood in between. The merchant would have presumably solved his predicament by paying a toll each time he required safe passage and indeed Lucre has solved its own predicament in a similar fashion, albeit the arrangement here was for unlimited usage over some period of time. But either way, the accommodations reached by the merchant and Lucre resulted in a license being granted, for a license is nothing more than:

9

> [t]he permission by competent authority to do an act which, without such permission, would be illegal, a trespass, a tort, or otherwise not allowable.

BLACK'S LAW DICTIONARY 920 (6th ed. 1990).

The court further observes that a license is conceptually the same as a lease. Lucre wanted to connect calls from Verizon but Lucre, at least in 2001, did not believe that it could do so without routing those calls through AT&T's "property" – that is, through its system. Therefore, Lucre needed AT&T's permission to use its system and, in fact, AT&T not only gave that permission but actually added to that system by providing the dedicated line needed to route the Verizon calls directly to Lucre. Granted, AT&T and Lucre do not agree as to the fee Lucre was to pay for AT&T's permission or the duration of the permission given.[16] However, there is no disagreement that AT&T could again deny Lucre access to its system if Lucre materially breached its agreement to pay just as a landlord would be entitled to repossess the demised premises if the tenant failed to pay the rent he had agreed upon as it came due. Indeed, it would seem that the only thing that distinguishes a lease from a license, at least when land is involved, is possession. That is, a lease involves the landlord's actual relinquishment of the property's possession to the tenant whereas the licensor is able to retain possession, albeit the possession retained is then limited by whatever rights the licensee is also entitled to enjoy under the terms of the license. 52 C.J.S. *Landlord & Tenant* § 337 (2010); 49 Am. Jur. 2d. *Landlord & Tenant* § 20 (2010).

---

[16]Again, it is AT&T's position that the fee was $3,185.78 per month in exchange for five years of uninterrupted usage and then $17,947.80 per month thereafter on a month-to-month basis. As for Lucre, it argues that the license granted was always month-to-month at the $3,875.78 rate.

The court makes this comparison between a license and a lease because of its decision in *In re Sturgis Iron & Metal Co.*[17] That case involved the commercial lease of a large piece of equipment to the debtor and the subsequent rejection of that lease by the Chapter 11 estate. The question in *Sturgis* was whether the lessor was entitled to the actual rent due on the lease during the two postpetition months that preceded rejection or whether the lessor was entitled to only some reasonable amount for that interval based upon the benefit realized by the estate, which, at least according to the debtor, was almost none at all.

This court concluded that the lessor in *Sturgis* was entitled to the actual rent. It employed the following logic:

- The commencement of a bankruptcy case creates an estate comprised of all of the debtor's interests in property, including whatever the debtor might hold as a tenant under a lease.[18]

- However, none of the interests acquired by the estate can be any greater than what the debtor had previously held unless the Bankruptcy Code itself creates a greater right.[19]

- Therefore, the estate must pay the actual rent due for its continued possession of the leased property since the Bankruptcy Code includes no provision that permits the estate to alter what is in effect the *sine qua non* of the estate's

---

[17]420 B.R. 716 (Bankr. W.D. Mich. 2009).

[18]*Id.* at 721.

[19]*Id.* at 722.

11

continued right to possession under a lease – the payment of an agreed upon rent.[20]

But if, as this court has now concluded, a license functions much like a lease, the reasoning in *Sturgis* should apply equally in the instant case. That is, the Chapter 11 estate created when Lucre filed its bankruptcy petition unquestionably acquired Lucre's prepetition rights under the Verizon DEOT contract to have continued access to the dedicated line that routed Verizon customers to Lucre. However, the estate's enjoyment of that access also depended unequivocally upon Lucre continuing to pay the same fee that Lucre had agreed upon prepetition to gain that access and that fee, according to AT&T, was $3,185.75 per month for the original five years and $17,974.80 per month thereafter until the license was either terminated or rejected.

However, the analogy to leases that *Sturgis* provides is not perfect, for this court, in deciding *Sturgis*, made a point of distinguishing between unexpired leases and executory contracts,[21] and licenses, it seems, can also have attributes of an executory contract. Take again, as an example, the German merchant. If all that is involved is the exchange of a toll for passage, then the arrangement resembles a lease. But, if the baron also promised to service the barge and feed the crew as part of an overall package, then the arrangement would more resemble an executory contract.[22] Indeed, in the instant case, the court would not be surprised if the Verizon DEOT contract also included a

---

[20]*Id.* at 741.

[21]*Id.* at 719-20. Indeed, this court relied upon that distinction to differentiate both Supreme Court and Sixth Circuit law. *Id.* at 726-27.

[22]As noted in *Sturgis*, leases can also include executory elements on the part of the lessor and Section 365(b)(4) in fact addresses the estate's ability to compel such performance obligations under a lease.

promise by AT&T to maintain the hardware and software used in order to ensure static free and uninterrupted connections. Therefore, the inevitable question arises as to whether the addition of such executory elements to a license makes a difference in determining what should be awarded the licensor as an administrative expense if the estate ultimately elects to reject the license. Section 503(b)(1).

This court submits that there is no distinction. The issue in each instance is simply whether an administrative claim should be allowed or not and the resolution of that issue is dictated by Section 503(b)(1), not Section 365.[23] As for Section 503(b)(1), it focuses only upon whether the cost or expense, however incurred, was (1) actual and (2) necessary for preserving the estate.

---

[23]In fact, Section 365 addresses an entirely different bankruptcy issue, that being whether the debtor can continue demanding performance under an executory contract or stay in possession under an unexpired lease notwithstanding its own pre- or postpetition breach of the contract or lease. As this court explained in *Sturgis*:

> [W]hat Section 365 actually offers to the trustee is the ability to suspend the estate's own performance under a lease or contract yet still avoid the consequences of any resulting default should it later elect to assume the same. Take, for example, a debtor who supplies parts to a third party pursuant to a requirements contract. If that debtor were to file for Chapter 11 relief, it could decide as debtor-in-possession to temporarily halt postpetition deliveries in order to assess whether it was in the estate's interest to continue with that contract or not. If, after reflection, the debtor decided to assume the contract, then it could in effect regain its right to resume deliveries and to receive payment for the same so long as the debtor was able to cure the estate's previous default and otherwise comply with the requirements of Section 365(b). Or the debtor, as debtor-in-possession, could ultimately decide to reject the executory contract with the equal assurance that whatever damages should arise from its decision to reject will be treated nonetheless as a prepetition indebtedness. 11 U.S.C. § 502(g)(1).

420 B.R. at 723.

13

In other words, it should be irrelevant whether AT&T had made executory promises to Lucre under the Verizon DEOT contract as well. Granted, these additional executory promises, if made and then breached, would have justified Lucre's withholding payment of the agreed upon licensing fee and likely would have warranted a setoff for damages incurred. But those additional promises would not alter the underlying fact that (1) AT&T had nonetheless given Lucre a license to use a dedicated line in its system for an agreed upon fee, and (2) utilization of that line (i.e., the Verizon DEOT) was necessary for Lucre to route Verizon customer traffic until the alternate line agreed upon in the settlement could be installed. Therefore, the analysis under Section 503(b)(1) should remain the same – that is, the Chapter 11 estate created when Lucre filed its petition could no more enjoy the continued use of AT&T's system under the license previously granted than could Lucre have enjoyed the continued possession of demised premises under a lease previously given without, in each case, the estate also paying as an administrative expense the agreed upon fee or rent in return.[24]

---

[24]Or, this court explained in greater detail in *Sturgis*:

Judge Learned Hand said years ago in *Palmer*:

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry. While such ad interim payments need not, and of course would not, constitute an adoption of the term, insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; **and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee.**

104 F.2d at 163 (emphasis added).

14

Lucre certainly argues that it should pay AT&T something much less than what was agreed as its administrative expense because it never benefited from the license granted. As Lucre puts it "[t]he Tariff Circuits [i.e., the Verizon DEOT] have been nothing but trouble for Lucre from the beginning."[25] That may be. But Lucre's clear desire throughout the Chapter 11 administrative period was to maintain Verizon as a revenue source. Moreover, there is no question that the Verizon traffic had to be routed through some third party system before Lucre could earn that revenue. Therefore, this court is hard-pressed to understand how AT&T's license to Lucre to use its system, as troublesome as it might have been, was not a necessary expense of preserving the estate unless and until Lucre was able to find an alternative route for its Verizon customer traffic through another system.

---

But, if Judge Hand's logic is sound, then what justifies the Committee's insistence that a lessor must forgo what is otherwise its due and accept instead as its administrative rent under Section 503(b)(1)(A) only that which is deemed fair under the circumstances? After all, Section 503(b)(1)(A) itself states that "there **shall** be allowed" as administrative expenses "the actual, necessary costs and expenses of **preserving the estate**" (emphasis added). The edges of what is meant by this language may be gray. However, given that the bankruptcy estate now includes leasehold interests from the outset of the case, it is difficult to imagine a more actual or necessary expense of preserving that estate than the payment of the very rent that nonbankruptcy law clearly recognizes as an absolute condition to the estate's continued possession of the property leased. Or, put differently, an estate cannot maintain property *cum onere*-i.e., property with a burden-without the estate also enduring the burden imposed.

*Id.* at 724-25 (emphasis in original) (footnotes omitted).

[25]Pl.'s Br. Mot. Summ. J. at 20.

15

In fact, whether the Verizon DEOT was even used postpetition is of no consequence, for it is enough that the license that Lucre had been given prepetition provided the ensuing bankruptcy estate an interest in AT&T's system that it would have otherwise not had. Rights arising under a license, though, cannot exist without the licensee also paying the promised fee. Fees associated with the license, then, by their very nature are an expense associated with the license's preservation. Granted, the estate's accumulation of fees on account of an unwanted license can prove expensive; however, the same can be said about utilities and other carrying costs that accumulate whenever the estate remains in possession of a marginal building. If such costs are burdensome, the appropriate relief is to reject the license or to abandon the building. However, until that rejection or abandonment occurs, the plain language of Section 503(b)(1)(A) recognizes these accruals as necessary expenses entitled to priority without adjustment of any kind.

Administrative Claims and Postpetition Inducement - *Mammoth Mart, Jartran,* and *White Motor*.

Although Section 503(b)(1) as in fact written seems to allow as AT&T's administrative expense the actual fee associated with the Verizon DEOT license, Lucre relies upon case law interpreting Section 503(b)(1) to assert that AT&T must meet other tests as well. In particular, Lucre cites *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir. 1987).[26] *White Motor* involved a contract between Employee Transfer Corporation ("ETC") and the debtor. The contract required ETC to provide relocation services for the debtor's employees. These services included managing and maintaining homes purchased by ETC from debtor's relocated employees until ETC resold the homes to third parties. As of debtor's petition date, ETC owned eleven homes

---

[26]*White Motor* is one of the Sixth Circuit cases this court distinguished in *Sturgis* as involving an executory contract as opposed to an unexpired lease.

16

which had not yet been sold. ETC continued to manage these homes postpetition by making

mortgage payments, paying taxes and insurance premiums, and generally maintaining the property.

At issue in *White Motor* was whether ETC could recover those amounts as an administrative

expense.

The Sixth Circuit denied the request. It said:

> The test for whether a claim qualifies for payment as an administrative expense is set forth in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). In *Mammoth Mart* the court stated that a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the proceeding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. *Id.* at 954.

*White Motor*, 831 F.2d at 110.

The court also offered this further explanation concerning the first prong of this test:

> A creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession. *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984). However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority. *Id.* at 586.

*Id.*

What Lucre contends is that it never induced AT&T to continue providing postpetition access

to its system for the Verizon traffic. This is how Lucre itself articulates its position:

> AT&T has not established and cannot establish a post-petition contract or inducement. Service under the Tariff Circuits [i.e., the Verizon DEOT] was ordered by the pre-petition debtor back in 2002, long before Lucre filed for bankruptcy protection in 2005. Lucre did not enter into any new contracts with AT&T post-petition and Lucre

17

> did not induce AT&T to continue services under the Tariff Circuits post-petition.

* * *

> AT&T, however, kept the circuits in operation throughout this case. It was free not to, but it left in operation anyway [sic]. Given the legal positions consistently taken by Lucre from at least as early as May of 2006, however, there is no basis whatsoever for the conclusion that Lucre induced AT&T to do this.

Pl.'s Br. Mot. Summ. J. at 18, 20.

"Inducement," though, is not as important in this instance as Lucre would make it. Granted, *White Motor*, as well as many other courts, have cited the Bankruptcy Act case of *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*[27] as establishing a general test for allowing requests for administrative expenses. *See, e.g., In re Jartran, Inc.*, 732 F.2d 584, 586-87 (7th Cir. 1984); *Cumberland Farms, Inc. v. Fla. Dept. of Envtl. Prot.*, 209 B.R. 786, 791-92 (D. Mass. 1996). However, *Mammoth Mart* actually addressed only a very narrow issue – whether employees whose jobs were terminated shortly after the commencement of the debtor's case could recover as an administrative expense all of the severance pay to which they were contractually entitled even though that pay was attributable to service provided prepetition.

> Because the amount of the severance pay claims depends upon the length of employment, the consideration supporting appellants' claims was the services performed for Mammoth Mart over the entire period of each appellant's employment. Since no part of their present claims arise from services performed for the debtor-in-possession, no portion of appellant's claims may receive s 64(a)(1) priority.

*Mammoth Mart*, 536 F.2d at 955 (citations omitted).

---

[27]536 F.2d 950 (1st Cir. 1976).

*In re Jartran, Inc.*,[28] which is the other case relied upon in *White Motor*, involved the same narrow issue. In that instance, the debtor had an arrangement with some agencies to place Yellow Page advertising on its behalf. Ads had been ordered prepetition and the opportunity to cancel had by that time already passed with respect to many of those orders. Nonetheless, the agencies maintained that they should be paid as administrative claimants for the fees associated with this advertising because the debtor's obligation to reimburse them did not in fact arise until after the case had commenced. *Jartran*, not surprisingly, rejected this argument.

> In the case before us, no inducement by the debtor-in-possession was required because the liability for the costs of the ads was irrevocably incurred before the petition was filed.
>
> * * *
>
> It is clear, . . . that appellants' claim here arises out of commitments made before the debtor-in-possession came into existence.

*Id.* at 588.

And, in fact, *White Motor* also follows suit, for the focus in that instance was only upon the eleven properties that ETC had already purchased and had been maintaining under ad hoc contracts entered into between ETC and the debtor prepetition.[29] The Sixth Circuit certainly recognized that ETC had continued postpetition to incur expenses associated with these properties' maintenance and that the estate had benefited from the services ETC had rendered. Nonetheless, the Sixth Circuit concluded that the ongoing expenses were associated with commitments that ETC had already made

---

[28]732 F.2d 584.

[29]*White Motor*, 831 F.2d at 108. White Motor's original contract with ETC terminated in July 1980. White Motor then apparently entered into separate contracts with respect to the eleven properties that ETC purchased between the original contract's termination and White Motor's Chapter 11 filing in September 1980.

19

beforehand with the debtor concerning these eleven properties and, as such, administrative priority was not warranted.

> Although we feel that the services provided post-petition were beneficial to WMC as debtor-in-possession, **we find that ETC's claims arise from commitments made before the debtor-in-possession came into existence.**

*White Motor*, 831 F.2d at 110 (emphasis added).

However, it is just as interesting that there was no dispute in *White Motor* concerning the additional properties that ETC had purchased postpetition. As for the costs associated with maintaining these acquisitions, the parties agreed without question that all of those charges were entitled to administrative priority.[30] And in *Jartran* the parties also agreed that whatever Yellow Page advertising the debtor, as the estate's debtor-in-possession, had purchased postpetition was allowable as an administrative expense. Indeed, in that instance, they reached that agreement even though the postpetition purchases had been made under the very same contract as had the prepetition purchases been made and even though the debtor-in-possession eventually rejected that contract. *Jartran*, 732 F.2d at 586, n. 2.

The concern, then, in *Mammoth Mart*, *Jartran*, and *White Motor* was a limited one that arose only because the claim in question seemed to straddle the petition date. As such, the issue in each instance was whether the particular claim should be treated as having arisen pre- or postpetition. In turn, each court's response was based upon its recognition that the whole purpose of permitting administrative priority to a claimant was to induce otherwise reluctant entities to continue providing whatever the bankruptcy estate needed for its preservation, maintenance, and rehabilitation.

---

[30]*Id.* at 110, n. 3.

> The application of s 64(a)(1) [now Section 503(b)(1)(A)] to Chapter XI arrangements is primarily a means of implementing the statutory objective of facilitating the rehabilitation of insolvent businesses. Congress recognized that, if a business is to be reorganized, third parties must be willing to provide the necessary goods and services. Since they clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor, s 64(a)(1) provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate.

*Mammoth Mart*, 536 F.2d at 954 (citations omitted); *see also Jartran*, 732 F.2d at 586; *White Motor*, 831 F.2d at 110.

*Mammoth Mart* then went on to explain how a court was to address claims arising from a contract that had been entered prepetition.

> For a claim in its entirety to be entitled to first priority under s 64(a)(1), the debt must arise from a transaction with the debtor-in-possession. When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

*Id.*

Finally, *Mammoth Mart* offered examples of when such "straddling" contract claims are to be treated as postpetition administrative expenses and when they are to be left to fend with the rest of the creditors holding prepetition claims.

> When third parties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected,

the purposes of s 64(a)(1) plainly require that their claims be afforded priority. It is equally clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing.

*Id.* (citation and footnote omitted).[31]

However, what cannot be lost in *Mammoth Mart* and its effort to address such straddling claims is that court's unequivocal affirmation of the Supreme Court's much more general ruling in *Reading Co. v. Brown*[32] concerning the allowance of administrative expenses. This is what *Mammoth Mart* said:

> Since the debtor-in-possession is a separate legal entity that is carrying on the business principally for the benefit of the pre-filing creditors, **the Court has reasoned that fairness requires that any claims incident to the debtor-in-possession's operation of the business be paid before those of creditors for whose benefit the continued operation of the business was allowed.** *See Reading Co. v. Brown, supra* at 478, 88 S.Ct. 1759.

536 F.2d at 954 (emphasis added).

---

[31]In *Jartran*, the panel applied *Mammoth Mart*'s observations to conclude that the straddling claim in that instance should also be treated as having arisen prepetition.

> Likewise, while Jartran (as the debtor-in-possession) enjoyed the benefits of the published ads, the transaction out of which these benefits arose was completed before the petition was filed and nothing could have been done to further or cancel the transaction after the petition filing. Thus, the matter was outside the scope of § 503.

*Jartran*, 732 F.2d at 589.

[32]391 U.S. 471, 88 S. Ct. 1759 (1968).

22

And in *Jartran*, the court observed:

> It is well settled that expenses incurred by the debtor-in-possession in attempting to rehabilitate during reorganization are within the ambit of § 503.

732 F.2d at 586 (citing *Reading Co. v. Brown*).

Indeed, lest there be any doubt as to how expansive *Reading*'s notion of an administrative expense is to be, the administrative claim that was actually allowed in *Reading* was on account of a tort attributable to the trustee.[33]

In sum, then, the inducement language used in *White Motor* and *Jartran* must be read in the broader context of Section 503(b)(1) and its effort to include within its scope all "actual and necessary costs . . . ordinarily incident to operation of a business . . . ." *Reading*, 391 U.S. at 483. Inducement, as *White Motor*, *Jartran*, and *Mammoth Mart* all illustrate, is important only when a court is called upon to determine whether a claim arising from a prepetition contract with the debtor is (1) in fact deserving of administrative priority because its incursion was actually incidental to the estate's continued operation; or (2) simply residue of a prepetition transaction that is no more deserving of priority than any other prepetition claim.

---

[33]Technically, it was the estate's receiver, as opposed to the estate's trustee, who had committed the tort because *Reading* involved a Chapter XI case under the former Bankruptcy Act. The debtor had filed its petition for relief when the tort occurred. However, the debtor had not yet been adjudicated a bankrupt. Consequently, it was the "receiver" appointed by the district court to operate the debtor's business during this postpetition gap who was responsible. Nonetheless, this court has chosen trustee over receiver because under the current Code there would have been no gap and, therefore, it would have been the trustee (or debtor-in-possession) who would have been responsible for the postpetition tort.

23

The Sixth Circuit has said in *Sunarhauserman*: "*Reading* does not eliminate the requirement that a debt arise post-petition in order to be accorded administrative expense priority."[34] But the converse is equally true – that if it is clear that a debt did arise postpetition, then *Reading* requires that it be treated as an administrative expense so long as the expense is "ordinarily incident" to the operation of the postpetition business. Indeed, *Jartran* well illustrates this point. Again, the agencies in *Jartran* were denied administrative priority for the advertising that had been irrevocably placed by them on the debtor's behalf prepetition. It made no difference that the debtor's contract with them did not permit billing for that advertising until after the case had begun. What has been overlooked, though, is that these same agencies, under the same prepetition contract, had also placed advertising on behalf of the debtor before the bankruptcy's commencement that the debtor, now as debtor-in-possession, could still revoke postpetition. As for costs associated with this advertising, both the court and the debtor agreed that these bills should be paid as administrative expenses even though the estate was no more involved in the inducement of this advertising than it was involved in the inducement of the advertising for which no priority had been awarded. The distinguishing factor, according to the court, was simply whether the debtor-in-possession could later change its mind. *Id.* at 732 F.2d at 586. In other words, so long as the estate had had that option but had not exercised it, the court in *Jartran* was not going to deny the agencies' administrative priority for something that otherwise fell clearly within the parameters that *Reading* had previously set.[35]

---

[34]*Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 817 (6th Cir. 1997).

[35]While *Mammoth Mart, Jartran,* and *White Motor* all involved administrative requests for claims that straddled a case's commencement, similar struggles have occurred with respect to claims that straddle a case's closure. For example, in *Zurich Am. Ins. Co. v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 536 F.3d 683 (6th Cir. 2008), the debtor's arrangement with its insurance

AT&T is not an eleemosynary society nor is the estate created when Lucre filed for Chapter 11 relief a charity case. Rather, what is before this court is a matter of commerce and the question posed by these two businesses is simply this: Should the estate, as opposed to the prepetition debtor, be treated as AT&T's customer for what all agree was Lucre's unimpaired ability to continue having the desirable Verizon telephone traffic routed through AT&T's system for some three and one-half years after Lucre had become the estate's debtor-in-possession? For Lucre, then, to insist that its utilization of AT&T's system for this extended period falls outside of what *Reading* would regard as "ordinarily incident" to the estate's success is disingenuous. The Verizon DEOT that AT&T provided may have been both expensive and bothersome. However, until Lucre actually replaced it with some alternative system, AT&T was how Lucre, as debtor-in-possession, accomplished the estate's business objectives. As such, AT&T has a basis for asserting the administrative claim that it makes.

But, as already discussed, AT&T cannot simply expect to be paid for whatever benefit Lucre enjoyed from its continued willingness to route the Verizon traffic through its system because its claim ultimately must be rooted in either contract or some other legal theory. Again, if Lucre is to be believed, AT&T's right to receive an administrative claim was lost altogether when Lucre allegedly terminated the relationship in 2006 or, at the very least, AT&T's right to receive what it

---

carrier was for it to provide coverage in one year but to defer recovering from the debtor the deductible associated with that coverage until a claim had actually been paid, which could be well after the covered incident. The panel in *HNRC* did not allow the carrier an administrative claim for this prospective liability, although it was clear that the debtor's business actually benefited during the pendency of the Chapter 11 as a result of the coverage provided. However, in a subsequent case, a different Sixth Circuit panel has expressed doubt about the soundness of *HNRC* and, in fact, Judge Cook, in a concurrence, suggested that *HNRC* be reversed *en banc. Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835 (6th Cir. 2010).

25

claims has been diminished because of either waiver or its own dilatory ways.[36]  However, these are contract issues that arise separate and apart from whether the services provided by AT&T otherwise should fall within the scope of what the Supreme Court in *Reading* determined should be allowed as an administrative expense under former Act Section 64(a)(1) and now under current Section 503(b)(1)(A).

---

[36]In other words, AT&T cannot have it both ways.  If this court should ultimately conclude that AT&T no longer has a right to a postpetition fee under the existing license, Section 503(b)(1)(A) will not create for it a new right.  Rather, AT&T must turn to whatever other recourse it might have under nonbankruptcy law for recovery (e.g., quantum meruit).

As for the defenses raised, the court is satisfied that the pending motion is not the appropriate vehicle for disposing of the same.  For example, by AT&T's own admission, the Verizon DEOT license converted from the original five year term to a month-to-month relationship no later than 2007.  Consequently, Lucre would have had the right to terminate the relationship at any time after it converted from the original five year term.  Indeed, if Lucre is correct, it had the right to terminate even during the original five year period.  Moreover, an inference can be drawn from what has been presented that Lucre in fact exercised its right to terminate in May of 2006.  This inference derives from Steven Hale's post-hearing affidavit and is corroborated by AT&T's alleged cessation of billing for the Verizon DEOT license at roughly the same time.

Of course, if the license was legitimately terminated, the question arises as to why Lucre should pay anything to AT&T as an administrative claim after that date.  Quantum meruit might justify recovery had AT&T actually continued delivering something to Lucre post-termination.  However, if the Verizon DEOT is nothing more than a "true" license – i.e., a license where AT&T's performance was complete upon giving the required permission at the outset of the relationship – then it is fair to ask why AT&T should be able to receive anything for what would appear to be its own failure to shut down the Verizon DEOT and otherwise deny Lucre access to a system it no longer had a right to use.  Certainly, this would be the outcome had there been a lease instead, for landlord/tenant law in Michigan states that a landlord is not entitled to recover rent from a holdover tenant on a terminated lease unless the lease itself so provides or a new tenancy is created.  *Sturgis*, 420 B.R. at 749.

In sum, the court cannot find sufficient inferences one way or the other to grant summary judgment.  The court could find that AT&T's right to receive the continuing fee under the Verizon DEOT license terminated well before December 30, 2008 and, as such, AT&T is not entitled to some or even all of the additional license fees that are in dispute.  Conversely, there is equal latitude for the court to find that AT&T's right to receive fees on account of the Verizon DEOT license continued until the five year term concluded postpetition and that the right continued even thereafter at the much higher rate claimed by AT&T for at least some period of time before it finally was terminated.

26

Administrative Claims and Benefit to the Estate - *Mammoth Mart, American Anthracite,* and *United Cigar.*

Lucre's remaining argument against the allowance of AT&T's claim as filed is that it exceeds the actual benefit Lucre realized from its use of the Verizon DEOT and, as such, its claim should be reduced accordingly. In fact, if the court accepts Lucre's contention that what AT&T did provide postpetition was more trouble then it was worth, then this argument becomes just a variant of what Lucre has already argued concerning inducement – that AT&T should receive nothing as an administrative expense with respect to the Verizon DEOT.

In taking this position, Lucre again points to the test *White Motor* adopted for evaluating administrative claims. However, this time Lucre focuses on the second prong of that test, which is that the claimant must also "prove that the debt . . . directly and substantially benefitted the estate." *White Motor* at 110 (citing *Mammoth Mart,* 536 F.2d at 954). *See also Jartran,* 732 F.2d at 587. Lucre, though, fails to appreciate how the courts were referring to benefit as they made their decisions in these cases. For example, it arose in *Mammoth Mart* in this fashion:

> For a claim in its entirety to be entitled to first priority under s 64(a)(1), the debt must arise from a transaction with the debtor-in-possession. When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

536 F.2d at 954.

And *Jartran* discusses "benefit" as follows:

> All creditors, to some extent, assume the risk of bankruptcy. Appellants may, by the arrangement [i.e., contract] they made with Jartran, have assumed the risk for too long a period. It may seem

27

inequitable that no priority is granted even though the benefits of appellants' performance were enjoyed by Jartran only after the onset of reorganization. However, recognition of appellants' equitable claim would presumably be at the expense of other pre-petition creditors and thus would violate the fundamental principle underlying the bankruptcy laws that all parties that have extended credit to the debtor should share equally with similarly situated creditors. The logic of appellants' fairness argument would apparently require priority for all creditors whose extension of credit *benefited* the debtor-in-possession regardless of when the credit was extended.

732 F.2d at 590 (emphasis in original).[37]

Of course, when properly read in context, what these courts said is nothing more than common sense. After all, the very purpose of administrative priority is to encourage third parties to provide goods and services needed by the estate for its preservation and, hopefully, rehabilitation. *Mammoth Mart*, 536 F.2d at 954. However, that purpose is complicated whenever the administrative claim arises in connection with a contract already made between the debtor and the claimant. Again, as *Mammoth Mart* itself explained:

> When third parties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, the purposes of s 64(a)(1) plainly require that their claims be afforded priority. It is equally clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit

---

[37]Ironically, the Sixth Circuit in *White Motor* actually found that the estate had benefited from the services the claimant had rendered. Nonetheless, it held that awarding administrative priority was inappropriate because the claim arose from a commitment that had been made with the debtor prepetition.

> Although we feel that the services provided post-petition were beneficial to WMC as debtor-in-possession, we find that ETC's claims arise from commitments made before the debtor-in-possession came into existence.

831 F.2d at 110.

28

> to the bankrupt estate after the filing. *See Denton & Anderson Co. v. Induction Heating Corp.*, 178 F.2d 841 (2d Cir. 1949) (Frank, J.). Similarly, even when there has technically been performance by the contract creditor during the reorganization period, he will not be entitled to s 64(a)(1) priority if the bankrupt estate was not benefitted in fact therefrom. *Cf. American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S. A.*, 280 F.2d 119, 124-25 (2d Cir. 1960).

536 F.2d at 954 (footnote omitted).[38]

In sum, then, *Mammoth Mart*, *Jartran*, and *White Motor* state what should be self-evident – that whenever a pre-existing contract is involved, it is not enough that the estate benefited from whatever the other party had provided under its terms. The estate must also have been involved in some way regarding the provision of the same. Likewise, the converse should be equally apparent – that the estate must in all cases have benefited in some way from whatever activity it induced, although, as *Reading* teaches, "benefit" must be read broadly enough to include torts and other claims of a similar nature.

Unfortunately, subsequent courts have gone beyond what *Mammoth Mart*, *Jartran*, and *White Motor* actually held to impose a much stricter limitation upon what is to be allowed administrative priority whenever the claim in question arises from a prepetition lease or contract that the estate later rejects. What these subsequent courts have held is that priority is to be given only to the extent the estate in fact benefited from the rejected lease or contract. "Benefit," though, does not appear in Section 503(b)(1). Nor is it easy to add a beneficial component to Section 503(b)(1)'s "actual" and

---

[38] *See also Jartran*, 732 F.2d at 589 ("Likewise, while Jartran (as the debtor-in-possession) enjoyed the benefits of the published ads, the transaction out of which these benefits arose was completed before the petition was filed and nothing could have been done to further or cancel the transaction after the petition filing. Thus, the matter was outside the scope of § 503.").

29

"necessary" language and still reconcile *Reading*'s inclusion within the scope of that section,[39] a decidedly non-beneficial claim like the tort involved there.

What these subsequent courts have relied upon instead is a body of case law apart from *Reading* that also predates the Code. *In re Carmichael* is a good example of such reliance.

> The use of the terms "actual" and "necessary" were not accidental but were included to impose the requirement that the estate is actually benefited. **The language of § 503 continues the longstanding rule under the former Bankruptcy Act that a creditor's right to payment will be afforded priority only to the extent the estate was benefited in fact from the consideration supporting the creditor's claim.**

109 B.R. 849, 851 (Bankr. N.D. Ill. 1990) (emphasis added).[40]

*American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*[41] is frequently the pre-Code case cited for this proposition and, in fact, *Mammoth Mart* also cited this case when it reached its own conclusion as to benefit and the allowance of administrative expenses. *American Anthracite* involved the debtor's charter of ships for the overseas transport of coal. The debtor in

---

[39]*Reading*, of course, was interpreting former Section 64(a)(1), not Section 503(b)(1). However, the former section and the current section are virtually identical.

[40]*See also In re Kent Holland Die Casting & Plating, Inc.*, 125 B.R. 493, 502 (Bankr. W.D. Mich. 1991); *In re Hooker Invs., Inc.*, 145 B.R. 138, 145 (Bankr. S.D.N.Y. 1992); *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. 606, 610 (N.D. Ga. 1985); *Kinnan & Kinnan P'ship v. Agristor Leasing*, 116 B.R. 162, 166 (D. Neb. 1990); *Peninsula Gunite*, 24 B.R. at 595; *Peoples Gas System, Inc. v. Thatcher Glass Corp. (In re Thatcher Glass Corp.)*, 59 B.R. 797, 799 (Bankr. D. Conn. 1986); *Case Credit Corp. v. Baldwin Rental Centers, Inc. (In re Baldwin Rental Centers, Inc.)*, 228 B.R. 504, 513 (Bankr. S.D. Ga. 1998); *In re Bridgeport Plumbing Products, Inc.*, 178 B.R. 563, 565 (Bankr. M.D. Ga. 1994); *In re Curry Printers, Inc.*, 135 B.R. 564, 579 (Bankr. N.D. Ind. 1991); *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.)*, 163 B.R. 899, 908 (Bankr. D. Mass. 1994); *In re Spectrum Info. Technologies, Inc.*, 193 B.R. 400, 407 (Bankr. E.D.N.Y. 1996); *In re Ram Mfg. Inc.*, 38 B.R. 252, 254 (Bankr. E.D. Pa. 1984).

[41]280 F.2d 119 (2nd Cir. 1960).

30

that instance had, prior to filing, reserved two freighters but had then rejected the charters in the ensuing Chapter XI case when it did not have coal to ship. Not surprisingly, the ships' owners demanded that the estate reimburse them for the demurrage charges associated with the vessels remaining dockside during the postpetition interval prior to rejection.

The Second Circuit agreed with both the bankruptcy referee and the district court that the owners were not entitled to any priority claim because the idle ships had not provided any benefit to the estate. Therefore, it would certainly seem that *American Anthracite* is good authority for the proposition that *Carmichael* and so many other courts now recite as well settled law concerning benefit and its limiting effect upon the allowance of administrative claims.

*American Anthracite*, though, like *Mammoth Mart*, was decided under the Bankruptcy Act. Consequently, it reflects norms peculiar to that time. In particular, *American Anthracite* drew upon then existing case law concerning rejected real property leases and the allowance of administrative rent associated with the same.

> The claim of a creditor having an executory contract with the debtor at the time the debtor's petition is filed is entitled to priority under these provisions only if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it. The right to priority in the event the contract is assumed follows from the fact that the trustee or debtor in possession has elected to make the contract of the debtor his own, just as if it had been made by the trustee or debtor in possession in the first instance. The right to priority in the event the trustee or debtor in possession receives benefits under the contract during the interval between the filing of the debtor's petition and the rejection of the contract 'is an equitable right based upon the reasonable value' of the benefits conferred, rather than upon the contract price. Where no benefits are received by the bankrupt estate or its representative under the contract, and the contract is not assumed, the creditor's claim is not entitled to priority, although of course, upon rejection, the creditor may file a general claim against

31

the estate. *See* § 63, sub. a(9), 353, 11 U.S.C.A. §§ 103, sub. a(9), 753.

> These principles have most often been applied by the courts with respect to leases of real property. In such cases it is said that, unless the trustee or debtor in possession elects to assume the duties of the bankrupt lessee under the lease, he is liable only for actual use and occupancy of the property. Constructive possession by the trustee or his collection of sub-rents for remission to the lessor, or even actual possession by the bankrupt, is not sufficient to warrant a grant of priority to the lessor's claim.

*Id.* at 124-25 (citations omitted).

However, while *American Anthracite*'s logic was correct under the constructs of the former Act, a fundamental change in the Bankruptcy Code concerning the estate's administration of executory contracts and unexpired leases undermines its current application. This court explained this change at length in *Sturgis*.[42] Suffice it for purposes of this opinion that the *American Anthracite* approach is premised upon the fiction first adopted in *Copeland v. Stephens*[43] that the bankruptcy estate did not become a party to an executory contract or lease at the outset of the case; rather, the

---

[42]420 B.R. at 727-41.

[43](1818) 106 Eng. Rep. 218 (K.B.). Copeland was a lessor of real property and Stephens was his tenant. Stephens had also declared bankruptcy. Consequently, Stephens claimed that he did not owe any further rent to Copeland on the theory that the leasehold and its attendant obligation to pay rent had passed to his assignees along with the rest of his property under the bankruptcy laws.

The court disagreed, concluding instead that the assignees did not automatically take the leasehold interest upon the commencement of the bankruptcy case, but rather took the interest only if they in fact later accepted it through some manifest act. In other words, it was up to the bankruptcy assignees to decide whether to be bound or not by the particular lease, and as a consequence, it remained Stephen's obligation to pay the post-filing rent to Copeland until such an acceptance was made, if ever.

32

rights under the contract or lease did not actually become the estate's property unless and until the trustee made it part of the estate through the affirmative postpetition act known as assumption.[44]

But that decision inevitably lead to the question of what should the landlord be paid for any occupancy by the estate during the interval prior to the estate actually making the leasehold its own. The answer, the Act courts decided, depended upon what the estate did. If the lease was assumed, then assumption related back to the outset of the case, thereby making the estate liable for all rent under the lease as if it had been a contracting party all along.[45] Rejection, though, posed a problem, for it was well settled under landlord/tenant law then, as it is now, that a property owner is entitled to rent from someone occupying his property only if there is privity between the two.[46] Consequently, the fiction that the estate did not become a party to the lease until it was assumed prevented the landlord from demanding that the estate pay the agreed upon rent for its postpetition

---

[44]For example, in the frequently cited case of *Reisenwebers v. Irving Trust Co. (In re United Cigar Stores Co.)*, the court said:

> Neither chancery receivers nor trustees in bankruptcy are automatically vested with the title to leaseholds belonging to an insolvent. They take title to a lease only in case they conclude that acceptance is advantageous to the estate and elect to adopt the lease within a reasonable time.

69 F.2d 513, 515 (2nd Cir. 1934).

Indeed, it was *United Cigar* that *American Anthracite* relied upon as explaining the treatment of real property leases under the former Act.

[45]"If they [trustees] do so elect [to assume a lease], the title relates back to the date of the filing of the bill or petition." *United Cigar*, 69 F.2d at 575. *See also American Anthracite*, 280 F.2d at 124.

[46]49 Am Jur. 2d *Landlord & Tenant* § 18 (2010); 52A C.J.S. *Landlord & Tenant* § 1098 (2010).

occupancy of the premises in the event the trustee ultimately decided that the estate would not assume its terms.

The courts, though, recognized the inequity of permitting the landlord nothing for the interval between the petition date and the lease's rejection if in fact the estate had benefited through its continued occupancy of the premises.  Therefore, the courts seized upon the notion of quantum meruit to award the landlord with whatever seemed reasonable based upon the benefit realized by the estate.  As the *American Anthracite* panel observed later in its opinion:

> Indeed, it is most apparent from those cases which hold that the measure of compensation to which the lessor is entitled is not the amount due under the contract or lease but the fair value of the benefit conferred upon the estate that the purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him.

280 F.2d at 126 (citations omitted).[47]

The Bankruptcy Code, though, eliminated the fiction upon which the *American Anthracite* approach is premised.  The Code instead provides that the debtor's interests in whatever executory contracts or unexpired leases he has as of the commencement of his case immediately becomes the estate's.  Consequently, the accepted rationale for excusing the estate from paying the agreed upon rent for its continued occupancy of the leasehold granted – i.e., that the estate did not become a party

---

[47]*See also United Cigar,* 69 F.2d at 515:

> So far as they go into occupation of leased premises without adopting the lease, the landlord has a right to compensation for use and occupation out of funds in their hands.  It is an equitable right based upon the reasonable value of the use and occupation.

(citations omitted).

to the lease's terms unless and until it was later assumed – no longer exists. Indeed, the concerns

Judge Hand expressed when the *American Anthracite* approach was first adopted are even more

poignant today.

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry. While such ad interim payments need not, and of course would not, constitute an adoption of the term, insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; **and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee.**

*Palmer v. Palmer*, 104 F.2d 161, 163 (2nd Cir. 1939) (emphasis added).[48]

---

[48]*Palmer* itself is often cited by modern courts as yet another Act case supporting the proposition that the administrative rent to be awarded in connection with a rejected lease is to be limited to only the benefit realized by the estate. *See, e.g., In re GHR Energy Corp.*, 41 B.R. 668, 670 (Bankr. D. Mass. 1984); *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 934 (Bankr. W.D. Tex. 1994). However, while Judge Hand did concede in *Palmer* that the recognized law was just as he had described it, he did so only reluctantly. Indeed, he followed his concession with this musing:

> Be that as it may, the trustee need not pay the rent during the probationary period, and the court will hold off the lessor, and force him to be content with the value of the use and occupation meanwhile, though ordinarily it will fix that at the same amount as the rent. This was the result in *Quincy, etc., R. Co. v. Humphreys*, 145 U.S. 82, 12 S.Ct. 787, 36 L.Ed. 632, and in *United States Trust Co. v. Wabash Railway*, 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085, though so many other circumstances were thought relevant that we are not clear as to the precise scope of either ruling. But we have ourselves a number of times declared that the trustee's title 'relates back', or that he is liable only for use and occupation, and in some instances what we said was necessary to the result. Whether justified in principle or note, the doctrine has by now become too well fixed to be uprooted, especially since no change was made when the whole subject was overhauled in the Chandler Act.

*Id.* (citations omitted).

For these reasons, then, this court is not persuaded by *Carmichael* and the myriad other cases that have cited *American Anthracite* or *United Cigar*[49] that administrative claims are to be allowed "only to the extent the estate was benefited . . . ." *Carmichael*, 109 B.R. at 851.

Administrative Symmetry - Executory Contracts and Unexpired Leases.

Ironically, *American Anthracite* itself makes the case for treating administrative claims related to rejected executory contracts the same as administrative claims related to rejected leases. What it said was:

> No rational basis exists for drawing a distinction between the right to priority where contracts for the lease of real property are concerned and that right where other kinds of contracts are involved.

280 F.2d at 125.[50]

---

Interestingly, *American Anthracite* also relied upon Congress' failure in 1938 to affect any change in the Chandler Act as further justification for its own conclusions concerning administrative rent.

> In spite of these amendments favorable to contract creditors, Congress did not see fit to revise the doctrine limiting the priority of executory contract claim [sic] to circumstances where the contract was assumed by the trustee or debtor in possession or the property was actually used. It is not for the courts to read such an amendment into the statute.

280 F.2d at 126.

It is fair, then, to assume that the panel in *American Anthracite* would have come to the opposite result if it were sitting today, given that Congress in fact now has acted through its complete overhaul of the bankruptcy laws in 1978 to eliminate the crucial fiction upon which *American Anthracite* and other Act courts had previously relied.

[49]*See Sturgis*, 420 B.R. at 731, n. 37.

[50]*See also Jartran*, 732 F.2d at 589:

> [E]ven though the Agreement may have been an executory contract

36

This court agrees.  Take, for example, a requirements contract under which the debtor purchases from its vendor a particular part at a fixed unit price.  If the debtor, after filing, wanted to suspend purchases for a time in order to reassess the pricing, Section 365, with its provision for cure, would give the Chapter 11 estate the opportunity to rectify any ensuing default in the event it decided that assumption of the existing contract was the best course.  However, an entirely different question arises if the debtor, as the Chapter 11 estate's representative, were to continue making purchases from the vendor pending its decision to assume or reject.  It is certainly conceivable that the estate and its vendor could agree to a new temporary price during that interval.  It is equally possible that the two could agree to forgo with the former contract altogether and replace it with something entirely different.  In either event, the administrative claim for any unpaid shipment would undoubtedly be based upon whatever had been agreed upon as the new price.

Should, though, the outcome be different were the Chapter 11 estate to elect instead to continue accepting delivery of parts under the existing contract while it was deciding whether to assume its provisions or reject it for some better deal?  While such an option would not have been conceivable under the former Act, the Code's elimination of the *Copeland* fiction[51] now places the estate in immediate privity with the vendor and, therefore, in the position to continue performance under the already established contractual relationship if the estate so desires.  Granted, the vendor

---

under § 365, in our view that fact is not dispositive for § 503 purposes.

[51]That is, the fiction that the debtor's interest in an unexpired lease or an executory contract did not become property of the estate immediately upon the commencement of the case, but rather only upon the trustee's later "assumption" of the same.

might refuse to continue deliveries because of a material breach by the debtor beforehand.[52]   If, though, the vendor was willing to proceed on that basis, should not the estate in turn be obligated to pay for whatever was then delivered at the agreed upon price as opposed to what the estate might claim thereafter as a more "reasonable" price should the contract later be rejected?[53]

Consider as well the trustee of a bankruptcy estate who wishes to continue the debtor's business but has neither the location nor the materials to proceed.   The trustee could rent the necessary space and contract to purchase the needed materials.   If, though, the trustee were to do so, this court doubts that *Carmichael* or any other court would limit the new landlord's administrative rent or the new vendor's administrative receivable to only what the estate ultimately realized as a benefit from the arrangements made.   Granted, the notice and hearing provision of Section 503(b)(1)

---

[52]If, as this court has concluded, the bankruptcy estate immediately becomes privy to an executory contract under the Bankruptcy Code, and if, as this court has also concluded, the estate can have no greater rights under that contract than had the debtor, then it follows that a vendor who had had the right to refuse further performance immediately before the commencement of the case because of the debtor's material breach should have the same right to refuse performance post-petition. *In re Lucre*, 339 B.R. 648 652-58 (Bankr. W.D. Mich. 2006).   Indeed, it is only through the affirmance of the contract pursuant to Section 365, together with the attendant ability under that section to cure breaches, that the estate can re-establish its ability to demand performance. *Id.*

[53]The court relies upon this reasoning to conclude that, to the extent AT&T provided the necessary routing, its right to recover an administrative expense is dictated by the terms of the Verizon DEOT license that the parties had agreed upon.   This conclusion might have been different were there evidence that Lucre and AT&T had struck some other arrangement at the outset of the Chapter 11 – e.g., that AT&T would allow Lucre continued use of its system for Verizon traffic at a new rate while they worked out their differences concerning the existing Verizon DEOT license or that a new arrangement would replace the old license altogether.   However, Lucre has offered nothing to support such an inference.   The inference instead is that to the extent Lucre had any postpetition dealings with AT&T concerning the continued use of its system for Verizon traffic, those dealings would have simply been part of an implicit understanding between Lucre and AT&T to continue, at least for the time being, doing business under the original Verizon DEOT license that had existed between Lucre and AT&T since 2001 or 2002, and to which the Chapter 11 estate then became a party when the bankruptcy case was commenced.

may require some involvement by the court before an administrative expense is finally allowed.[54]

However, once an authorized arrangement is made, the estate would have no recourse other than to honor the landlord's or the vendor's administrative claim based upon the terms to which it had become bound. In other words, the estate could not after the fact contend that only half of the rent due was entitled to priority because it turned out that the estate only needed half of what it had originally leased. Nor should the estate be able to return for full credit inventory it had previously purchased in the event that the inventory had yet to be used when operations finally terminated.

But if this is true, what then distinguishes this scenario from one where the trustee continues to enjoy the occupancy of property that the debtor had previously leased or from one where the trustee continues to accept delivery of materials under a contract that the debtor had previously reached? The point is that space is space and purchases are purchases. If, as *Reading* instructs, administrative priority is to be afforded to whatever is incidental to the preservation, maintenance,

---

[54]Section 503(b)'s requirement that there must be "notice and a hearing" before an administrative expense can be allowed is a bit odd if compared with, for example, the notice and a hearing requirement of Section 363(b), for the latter addresses only transactions where the trustee chooses to bind the estate (i.e., the sale, letting or use of the estate's property) whereas the former can involve undesired assessments as well (e.g., a fine or penalty, 11 U.S.C. § 503(b)(1)(C), or a tort claim, *Reading*, 391 U.S. 471). Therefore, Section 503(b) suggests that the court's inquiry under that section is not whether the trustee's decision is the best vis-a-vis what other parties in interest might propose, which would be the case under Section 363(b), *cf. In re Engman*, 395 B.R. 610, 619-22 (Bankr. W.D. Mich. 2008), but whether the reimbursement requested in fact falls within one of the categories under that subsection.

As such, it is perhaps best to say that the trustee has the inherent authority under Section 503(b) to bind the estate in connection with his day-to-day administration of the estate, including, for example, the leasing of warehouse space, but that a subsequent request for reimbursement on account of that lease could still be subject to the limited challenge of the lease having no conceivable connection to the preservation of the estate. Of course, a prudent landlord would avoid this risk by insisting that the requisite Section 503(b) finding be made at the time the lease is entered.

39

or rehabilitation of the estate, then whoever makes such a contribution should be reimbursed at what by contract is required.[55]

Asymmetry and *Bildisco*.

Federal courts are not bound by stare decisis, especially when called upon to interpret congressionally enacted legislation like the Bankruptcy Code. *Sturgis*, 420 B.R. at 761, n. 84. This is not to say that past efforts by other courts are not instructive. Nor is there any question that a succession of opinions that all offer the same interpretation aids in the consistent application of whatever law Congress has enacted. However, other courts' interpretations cannot substitute for a particular judge's duty to make his own assessment of what Congress intended when it combined particular words to form a statute. Therefore, as a general proposition, it should make no difference to a federal judge whether ten, twenty, or even fifty other judges have arrived at a different conclusion. A judge's first and foremost responsibility is to enforce the law that Congress itself enacted, not what other judges said it enacted.

Therefore, there is considerable latitude within the federal system for independent thinking and analysis. However, the federal judiciary is also a hierarchal system, and, like all hierarchies, subordination to superior authority is expected. The phrase "first among equals" comes to mind. That is, the Supreme Court, like this court, performs exactly the same interpretative function when it is called upon to address an issue raised by the Bankruptcy Code. However, if the Court's

---

[55]This symmetry, of course, did not exist under the former Act because of the fiction then used to defer establishing the estate's privity under an existing executory contract or unexpired lease until the trustee actually assumed the same. However, for better or for worse, the Bankruptcy Code has eliminated that fiction and, as such, there is no longer any reason to ignore what sound legal reasoning otherwise demands.

interpretation is different than this court's, it is the Court's interpretation that must prevail because

that court is, literally, the supreme court.[56]

I preface this portion of my opinion with this discussion because the Supreme Court has in

fact spoken with respect to how an administrative claim is to be measured when an executory

contract has been rejected.  Specifically, it has said this:

> Damages on the contract that result from the rejection of an executory
> contract, as noted, must be administered through bankruptcy and
> receive the priority provided general unsecured creditors. See
> 11 U.S.C. §§ 502(g), 507. **If the debtor-in-possession elects to
> continue to receive benefits from the other party to an executory
> contract pending a decision to reject or assume the contract, the
> debtor-in-possession is obligated to pay for the reasonable value
> of those services,** *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174, 61
> S.Ct. 538, 541, 85 L.Ed. 651 (1941), which, depending on the
> circumstances of a particular contract, may be what is specified in the
> contract, see *In re Public Ledger*, 161 F.2d 762, 770-771 (CA3 1947).
> See also *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954-955 (CA1
> 1976). Should the debtor-in-possession elect to assume the executory
> contract, however, it assumes the contract *cum onere, In re Italian
> Cook Oil Corp.*, 190 F.2d 994, 996 (CA3 1951), and the expenses and
> liabilities incurred may be treated as administrative expenses, which

---

[56]But again, the deference that a lower court is to give a superior court in the federal system is not a function of common law stare decisis. Rather, it derives from the administrative decisions made by the superior court.  For example, the Sixth Circuit could have permitted every panel confronting a particular issue the ability to decide for itself what should be the outcome without regard to what any previous panel had decided.  However, the Sixth Circuit instead has chosen to adopt a rule that obligates subsequent panels to follow whatever the first panel may have decided. *See* 6th CIR. R. 206(c).  That rule, of course, provides predictability and uniformity at the circuit level. It also, though, provides the same for lower court decisions within the circuit for, as a practical matter, it would make little sense for a lower court to decide one way with the knowledge that the Sixth Circuit will decide the other way no matter what panel may be later selected. *See Nat'l Sign and Signal v. Livingston (In re Livingston)*, 379 B.R. 711, 724-25, *rev'd* 422 B.R. 645 (W.D. Mich. 2009).  Conversely, it is the absence of such an administrative rule at the district court level that permits this court more discretion when a particular district judge in this multiple judge district has previously reversed it and the same issue is then presented again for consideration. *Id.  See also Starbuck v. City and County of San Francisco*, 556 F.2d 450, 457 n. 13; *First of Am. Bank v. Gaylor (In re Gaylor)*, 123 B.R. 236, 242 (Bankr. E.D. Mich. 1991).

41

> are afforded the highest priority on the debtor's estate, 11 U.S.C. § 503(b)(1)(A).

*N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531-532, 104 S. Ct. 1188, 1199 (1984) (emphasis added).

This court, with all due respect, believes that the Court is incorrect and that the reason for its error lies in relying upon case law decided under the former Act. Again, as this court explained in *Sturgis*, the notion under the former Act that only a reasonable amount is due as an administrative expense upon a rejected contract or lease stems from a legal fiction that has been replaced by a new approach under the Bankruptcy Code that mandates exactly the opposite conclusion.[57]

---

[57]*Bildisco* also included a decidedly different take on the administrative structure of a bankruptcy proceeding by premising its analysis upon the debtor-in-possession being:

> the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.

*Id.* at 528, 104 S. Ct. at 1197.

This court takes issue with the Court's premise because the pertinent "entity" in a bankruptcy case is not the debtor-in-possession nor, for that matter, the trustee. Rather, it is the estate created by Section 541 that must be reckoned with whenever a case is commenced. A bankruptcy estate is a legal entity that exists separate and apart from the petitioning debtor. As for the estate's trustee or debtor-in-possession, they are simply the representatives through which this fictional entity is able to act. An apt comparison is between a corporate entity and its officers and directors.

Unfortunately, the Court's failure to distinguish between the bankruptcy estate itself and its representative led to this conclusory statement:

> Obviously if the latter [i.e., the debtor-in-possession] were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place.

*Id.*

42

If *Bildisco*'s statements concerning reasonable value and rejected contracts were merely dicta, then this court could justifiably ignore the same and proceed with this matter in accordance with what it believes is the correct interpretation of the Bankruptcy Code. However, one of the two questions that the Court specifically addressed in *Bildisco* was whether the debtor had violated the labor laws by unilaterally terminating or modifying the collective bargaining agreement before any rejection of the same had been approved. Moreover, it is clear that the Court's conclusion that there had been no violation turned in part upon its belief that the estate had never become a party to the

Of course, the notion that the estate is not immediately a party to the debtor's executory contracts and unexpired leases is contradicted by, among other things, the Court's own observation years later in *Owen v. Owen* that:

> An estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions.

500 U.S. 305, 308, 111 S. Ct. 1833, 1835 (1991). *See also* H.R.Rep. No. 95-595, at 332 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6323; S.Rep. No. 95-989, at 82 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5868; *Triad Int'l Maint. Corp. v. Southern Air Transport, Inc. (In re Southern Air Transport, Inc.)*, 511 F.3d 526, 533-34 (6th Cir.2007) ("It follows that SAT's right under the lease to exclusively possess the aircraft constituted property of the estate under 11 U.S.C. § 541(a)(1)."); *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 430 (2nd Cir. 1987) ("The courts are in agreement that unexpired leasehold interests . . . constitute property of the bankrupt estate."); *Arizona Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Arizona Appetito's Stores, Inc.)*, 893 F.2d 216, 218 (9th Cir. 1990) ("A leasehold is property of the estate if a debtor is the lessee of the property at the time the petition for bankruptcy is filed.").

The Court's observation about the estate not being "bound by such contracts in the first place" is certainly consistent with how pre-Code courts would have used the *Copeland* fiction to prevent the bankruptcy estate from becoming privy to an unexpired lease or executory contract immediately upon the commencement of the case. However, the Bankruptcy Code, as the Court itself implicitly acknowledged in *Owen*, eliminates that fiction and, as a consequence, privity now exists with respect to such contracts and leases as soon as the petition is filed. Therefore, the Court too must rethink what is now meant by the term "rejection." It must also reassess postpetition relations between the estate and the other party during the interval before any such rejection takes place.

contract. That the Court chose *Philadelphia v. Dipple* over *American Anthracite* or *United Cigar* was only a matter of preference. The principle in all is the same – that is, a debtor-in-possession, at least under the former Act, was obligated to pay only reasonable value on an executory contract or unexpired lease if ultimately the lease or contract was rejected.

This court, then, faces the dilemma of either proceeding with what it believes is the correct interpretation of the Bankruptcy Code or obeying the ruling of a superior court. Although there appears to be no good solution, a solution nonetheless must be had. Therefore, this court reluctantly defers to its superior. The federal judicial system is hierarchal for a reason. It makes no sense at all for a lower court to rule one way knowing full well that the superior court will simply reverse whatever was decided because of its prior rulings. Indeed, were a bankruptcy judge like the undersigned to disregard Supreme Court or Sixth Circuit precedent simply because it did not agree, the expense of having to seek redress through a costly and time-consuming appeal could very easily deny an economically strapped debtor or similar litigant due process.

This court, therefore, will limit AT&T's administrative claim for Lucre's postpetition use of the Verizon DEOT to only "the reasonable value of those services"[58] if Lucre is able to establish that this particular relationship between Lucre and AT&T arises from an executory contract as opposed to simply a licensing arrangement. On the other hand, this court will look to whatever is the contracted rate to establish AT&T's administrative claim in the event that the court determines that the relationship between Lucre and AT&T is based upon a mere license. Unfortunately for both parties, the record is insufficient at this time to make that determination as a matter of law. Rather,

---

[58]*Bildisco*, 465 U.S. at 531, 104 S. Ct. at 1199.

an evidentiary hearing will be needed unless one or the other files a more comprehensive motion for summary judgment at some later date.

The Filed Rate Doctrine.

AT&T contends that it is in any event entitled to the $17,947.80 per month rate for Lucre's later usage of the Verizon DEOT because this case involves an industry with regulated pricing. Consequently, even if AT&T were to concede that, as a general proposition, an adjustment to a more reasonable amount is required whenever a rejected executory contract is involved, it argues in this instance that there can be only one "reasonable" rate – that rate being whatever rate is set by the regulatory agency. Or, to state the argument differently, if Lucre doesn't like the $17,947.90 rate that AT&T now insists upon, Lucre cannot use the bankruptcy court to usurp what is otherwise clearly the province of the regulator to decide.[59]

This concept, which is referred to as the "filed rate doctrine," is well established in connection with the enforcement of tariffs imposed under the Interstate Commerce Act. The Supreme Court itself described the doctrine in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*:

> The classic statement of the "filed rate doctrine," as it has come to be known, is explained in Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915). In that case, the Court held that a passenger who purchased a train ticket at a rate misquoted by the ticket agent did not have a defense against the subsequent collection of the higher tariff rate by the railroad.
>
> "Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the

---

[59]The Michigan Public Services Commission apparently has regulatory authority over the rate charged in this instance because intrastate telephone traffic is involved. However, it appears from AT&T's submissions that the MPSC uses as its rates the same rates as are set by the FCC.

> Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." *Id.*, at 97, 35 S.Ct., at 495.

497 U.S. 116, 127, 110 S. Ct. 2759, 2766 (1990).

> However, the Court in a later case offered this further explanation of the doctrine:

> The filed rate doctrine embodies the principle that a shipper cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate.

*Reiter v. Cooper*, 507 U.S. 258, 266, 113 S. Ct. 1213, 1219 (1993) (citations omitted).

The point, of course, is that Lucre is not asserting that some common law claim or defense renders AT&T's claim unreasonable, but that competing doctrine under another federally enacted scheme – to wit, the Bankruptcy Code – dictates that the reasonable rate is all that may be recovered as an administrative claim if the bankruptcy estate ultimately chooses to reject an executory contract subject to regulated rates.

Moreover, *Bildisco* itself seems to stand for the proposition that bankruptcy policy trumps whatever impetus there might be under federal telecommunications policy to restrict deviations from a published tariff to only the regulator's own discretion. Recall that the specific question in *Bildisco* was whether the Chapter 11 debtor-in-possession in that instance had committed an unfair labor practice under the National Labor Relations Act when it unilaterally modified a collective bargaining agreement. The Court answered by concluding that there could be no such violation unless and until the debtor-in-possession actually assumed the agreement.

> The necessary result of the foregoing discussion is that the Board is precluded from, in effect, enforcing the contract terms of the collective-bargaining agreement by filing unfair labor practices against the debtor-in-possession for violating § 8(d) of the NLRA. Though the Board's action is nominally one to enforce § 8(d) of that Act, the practical effect of the enforcement action would be to require adherence to the terms of the collective-bargaining agreement. But the filing of the petition in bankruptcy means that the collective-bargaining agreement is no longer immediately enforceable, and may never be enforceable again. Consequently, Board enforcement of a claimed violation of § 8(d) under these circumstances would run directly counter to the express provisions of the Bankruptcy Code and to the Code's overall effort to give a debtor-in-possession some flexibility and breathing space. See H.R.Rep. No. 95-595, p. 340 (1977). We conclude that from the filing of a petition in bankruptcy until formal acceptance, the collective-bargaining agreement is not an enforceable contract within the meaning of NLRA § 8(d). *Cf. Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341; *Dowd Box Co. v. Courtney*, 368 U.S. 502, 510-513, 82 S.Ct. 519, 524-525, 7 L.Ed.2d 483 (1962).

465 U.S. at 532, 104 S. Ct. at 1199.

Indeed, the "foregoing discussion" referenced in this quote included pertinent observations by the Court concerning the payment of only a reasonable value pending the debtor-in-possession's decision to assume or reject the contract involved. *Id.* at 531, 104 S. Ct. at 1199.

Ironically, the courts that had decided the former Act cases upon which *Bildisco* relied for its "reasonableness" proposition would have in all likelihood concluded that only the regulated rate could be considered under the circumstances. Granted, *Bildisco* itself suggests that the rate to be charged the estate for postpetition usage prior to rejection arises out of equity. However, as already explained, what actually drove these pre-Code decisions was the absence of a contractual relationship between the party providing the service and the bankruptcy estate until the contract was assumed and the resulting need to use the doctrine of unjust enrichment to fill in that gap. But unjust

47

enrichment is associated with the common law, not equity.[60] Consequently, a compelling argument can certainly be made that in a regulated environment the only rate available to the service provider and the bankruptcy estate to contract for would be the published tariff and, as such, there could be no other rate to consider as an alternative.[61]

In any event, the court will defer making a final determination as to what was to have been the appropriate rate to charge Lucre for its postpetition use of the Verizon DEOT until the other crucial issues concerning AT&T's provision of that service are also decided. Moreover, the parties are put on notice that this court does not necessarily accept AT&T's contention that $17,947.80 per month is the correct tariff even if it ultimately were to decide that deference should be given to the regulated rates. For example, it would appear that the $17,947.80 rate is set in part upon the assumption that a capital outlay is required by the provider before the service can commence. If so, then the actual tariff to be charged Lucre for continuing a service for which the outlay has already been recovered may be considerably less.

## CONCLUSION

In sum, there are genuine issues of fact regardless of whether the Verizon DEOT is treated as an executory contract or an unadorned license. If the latter, then the factual issues include when the DEOT could be terminated, whether it was in fact terminated, and when it would have expired

---

[60]*Richardson v. The Huntington Nat'l Bank (In re Cyberco, Inc.)*, 382 B.R. 118, 127-28 (Bankr. W.D. Mich. 2008).

[61]In *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3rd Cir. 1989), the lower court did not require the estate to pay the utility or administrative claim for its postpetition usage of natural gas prior to the ultimate rejection of the supply contract at the agreed-upon rate. Rather, the court concluded that the appropriate rate was the lower one then being charged to the utility's non-contract customers. However, in reaching this conclusion, it is important to note that the lower court limited its alternatives to only the two rates permitted under the regulatory scheme.

under the five-year term that AT&T contends originally applied. Proofs will also be needed to address the separate estoppel and delay defenses Lucre has raised. On the other hand, if the Verizon DEOT is in fact an executory contract, which itself is a factual issue, there will also remain the unanswered question of what is a reasonable amount. While Lucre has certainly offered its opinion that something less than $17,947.80 and even less than $3,185.78 would be reasonable, this court does not have enough to definitively state at this point what the reasonable amount should be, especially given that the contracted rates are to be given at least some deference in calculating what is reasonable under the circumstances.[62]

As for Lucre's claim for late fees, it is in and of itself a largely undisputed matter. That is, it requires only a calculation of whatever the parties agreed would be the late fee under the ICA and then appropriate consideration of the largely legal arguments that AT&T has raised for why the charges Lucre claims are not due. Nonetheless, the court determines it best to defer deciding this matter until it is in a better position to decide all of the outstanding issues at once.

---

[62]Nor is it altogether clear that Lucre's contractual arguments (e.g., termination) may even be considered if its arrangement with AT&T is determined to be an executory contract, for it would seem that Lucre is no more entitled to having it both ways than is AT&T. In other words, if the court is to substitute a reasonable rate for what otherwise had been the contracted rate on the theory that Lucre, as debtor-in-possession, never became bound by the actual Verizon DEOT contract, then it would seem that Lucre cannot rely upon contractual defenses such as termination to avoid having to pay what is otherwise the reasonable amount for the service enjoyed. Although Lucre's estoppel and delay arguments may be less susceptible to this argument, their applicability too may have to be reconsidered if it is ultimately decided that the Verizon DEOT is an executory contract.

49

Therefore, the court will enter a separate order denying both motions.

_____   7/20/10

Hon. Jeffrey R. Hughes
United States Bankruptcy Judge

Signed this 20th day of ___July___ 2010,
at Grand Rapids, Michigan.